O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| FRANK D. YTURRIA, TRUSTEE OF | § | |
| THE FRANK D. YTURRIA MINERAL | § | |
| TRUST, et al., | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 7:05 – cv – 181 |
| | § | |
| KERR-McGEE OIL & GAS | § | |
| ONSHORE, LP d/b/a KMOG | § | |
| ONSHORE LP, AND KERR-McGEE | § | |
| OIL & GAS ONSHORE, LLC, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are a plethora of filings.  They consist of Plaintiffs' Motion for Partial Summary Judgment [Dkt. No. 12]; Defendants' Reply to Plaintiffs' Motion for Partial Summary Judgment and Defendants' Cross-Motion for Summary Judgment [Dkt. No. 20, 22]; Plaintiffs' Reply to Kerr-McGee's Response to Motion for Partial Summary Judgment, Plaintiffs' Response to Kerr-McGee's Cross-Motion for Summary Judgment, and Plaintiffs' Cross-Motion for Summary Judgment on Kerr-McGee's Affirmative Defenses [Dkt. No. 27, 28, 29]; Plaintiffs' Reply to Kerr-McGee's Supplement of Summary Judgment Authority With *Tana Oil and Gas Corporation v. Cernosek* [Dkt. No. 36]; Plaintiffs Motion for Leave to File Supplemental Briefing and Supplemental Summary Judgment Evidence in Support of Their Cross-Motion for Summary Judgment on Affirmative Defenses [Dkt. No. 37]; and Defendants' Response to Plaintiffs' Motion for Leave to File Supplemental Brief and Supplemental Summary Judgment Evidence Regarding Affirmative Defenses [Dkt. No. 39].  Having duly reviewed the pending motions, the parties'

1

exhaustive briefing and evidence, and the applicable law, Plaintiffs' Motion for Partial Summary Judgment on their breach of contract claim is hereby GRANTED, Defendants' Cross-Motion for Summary Judgment is DENIED, and Plaintiffs' Cross-Motion for Summary Judgment on Kerr-McGee's Affirmative Defenses is GRANTED.   All other pending motions not addressed are DENIED.

## I. BACKGROUND

This suit involves the construction of two separate royalty provisions of four oil and gas leases and the method used by Defendants Kerr-McGee Oil & Gas Onshore, et al. ("Kerr-McGee" or "Defendants") to calculate the royalty payments paid to Plaintiffs Frank D. Yturria, Trustee of the Frank D. Yturria Mineral Trust, et al. ("Plaintiffs").

### A.  Factual Background

Plaintiffs are royalty interest owners and lessors of four oil and gas leases in the counties of Starr and Hidalgo, Texas.   The four leases ("the Leases") consist of the I.Y. Garcia Lease, J.A. Garcia Lease ("Garcia Leases"), Yturria 600-Acre Lease, and Yturria 350-Acre Lease ("Yturria Leases").   Defendants and their predecessors in interests are the lessees.

In the early 1980s, Plaintiffs entered into four leases with Defendants covering the lands in Starr and Hidalgo, Texas.   ([Dkt. No. 20-1] Defs.' Reply to Pls.' Mot. for Partial Summ. J. and Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot. for Summ. J.") 4).   Since 1983 Defendants drilled and put into production a number of gas wells on each of the leased properties.   *Id.* at 4-5. In order for the gas produced from these wells to be sold and shipped to consumers, it must be processed in a gas plant.   For this process to occur, the gas extracted from Plaintiffs' properties is put into pipelines and transported to processing plants.   *Id.* at 5.   The processing plants are owned

by a third party that contracted with Defendants to transport and process the gas generated from the leased premises. *Id.*

In 1993, Plaintiffs sued Defendants in two actions separate from the instant case.  The Yturrias and Garcias claimed Defendants impermissibly deducted transportation and treating charges for natural gas liquids ("NGLs") prior to calculating the Plaintiffs' royalty.  ([Dkt. No. 21] Mem. in Supp. of Defs.' Reply to Pls.' Mot. for Partial Summ. J. and Defs.' Cross-Mot. for Summ. J. ("Mem. in Supp. of Defs.' Cross-Mot. for Summ. J.") 2).  The 1993 lawsuits arose from an audit the Yturrias commissioned to review Defendants' royalty payments for the period 1988 to 1991. *Id.*  Defendants' position in the 1993 cases was that the transportation and treating costs incurred in connection with the transportation of NGLs was a proper deduction which was not barred by any of the clauses of the Leases. *Id.* at 3.  The 1993 lawsuits ended in settlement.

The outcome of the parties' settlement was an amendment to the Leases.  With respect to NGLs, the amendment required that Defendants pay "a royalty of one-fourth (1/4) of seventy-five percent (75%) of all plant products, or revenue derived therefrom, attributable to gas produced by [Defendants] from the leased premises."  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 5).  Except as amended, the Leases remained "in force and effect as written and heretofore amended."[1]  ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 26).

---

[1] The Yturria Leases state:  "Except as hereby amended, the Lease shall remain in full force and effect as heretofore amended." ([Dkt. No. 12-9] Ex. E at 13).  The Garcia Leases state: "Except as herein amended, the Lease shall remain in force and effect as written and heretofore amended." ([Dkt. No. 12-11] Ex. G at 7).

3

Two provisions of the aforementioned Leases are pertinent here.  They are  the "plant products royalty" provisions which were the result of amendment, and the "post-production costs" provisions which continued in full force and effect from the parties' previous agreement.  The "plant products royalty" provisions are almost identical in all four leases.  Regarding plant products, the Leases, in pertinent part, state,

> If gas . . . produced from the leased premises is processed in a hydrocarbon recovery plant for the recovery of liquid and/or liquefied hydrocarbons therefrom, and if Lessee . . . receives plant products, or revenue attributable thereto, then Lessor shall receive as a royalty one-fourth (1/4th) of seventy-five percent (75%) of all plant products, or revenue derived therefrom, attributable to gas produced by Lessee from the leased premises.

([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 4 (quoting Garcia Leases ¶ IV(b)(2)(i) and Yturria Leases ¶ 3(b)(2)(i))).  The "post-production costs" provisions are different in the Garcia Leases and in the Yturria Leases.  The Garcia Leases state,

> Lessor's royalty shall never bear, either directly or indirectly, any part of the costs or expenses of production, gathering, dehydration, compression, transportation (except transportation by truck), manufacture, processing, treatment or marketing of the oil or gas from the leased premises, nor any part of the costs of construction, operation or depreciation of any plant or other facilities or equipment for the processing or  treating of said oil or gas produced from the herein leased premises.

*Id.* (quoting Garcia Leases ¶ IV(d)).  The Yturria Leases state,

> Lessor's royalties hereunder shall never be subject to any amortization or interest or investment charge or deduction for transporting the same to a pipeline, or for gathering, transporting, producing, treating, separating, storing, compressing, dehydrating or marketing the same . . . .

*Id.* at 5 (quoting Yturria Leases ¶ 3(f)).

In 2003, Plaintiffs again audited Defendants' royalty payment scheme.  Through the audit, Plaintiffs learned Defendants reduced the amount of royalties paid to them by deducting or taking

4

into account a charge made by the owner of the gas processing plant for product marketing, transportation and fractionation of plant products ("T&F Fees") prior to calculating the royalties due to Plaintiffs.  ([Dkt. No. 5] Pls.' First Am. Compl.¶ 64; [Dkt No. 7] Defs.' Answer to Am. Compl. and Countercl. ¶ 64).

## B.  Procedural Background

On May 26, 2005, Plaintiffs filed a complaint against Defendants. ([Dkt. No. 1] Pls.' Original Compl. 2).  Plaintiffs alleged Defendants breached the lease agreements by deducting, prior to calculating royalties, transportation and treating charges of the gas extracted from Plaintiffs' land. ([Dkt. No. 5] Pls.' First Am. Compl. 11-12).  Plaintiffs asserted their oil and gas royalties on plant products should not bear any of the "T&F Fees" that the third party charged Defendants for product marketing, transportation and fractionation of plant products because the Leases expressly provide that royalties shall never bear such expenses.  *Id.* at 12.  Plaintiffs further alleged the improper deductions have reduced royalties due to Plaintiffs by more than $782,000.00 from January 2000 through December 2004.  *Id.*

Defendants answered Plaintiffs' complaint on July 18, 2005. ([Dkt. No. 7] Defs.' Answer to Am. Compl. and Countercl. 1).  Defendants admitted that "Kerr-McGee takes into account the 'product marketing, transportation and fractionation of Plant Products' Fee (the 'T&F fee') prior to calculating royalty due to Plaintiffs."  *Id.* ¶64.  Defendants also raised the affirmative defenses of waiver, estoppel, statute of limitations, and ratification.  *Id.*  Lastly, Defendants counterclaimed, alleging they had at all times properly calculated royalties owed to Plaintiffs under the terms of the Leases and asked for attorneys fees in connection with defending the present action.  *Id.* at 4.

5

On December 23, 2005, Plaintiffs moved for partial summary judgment.  ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 1).  Plaintiffs argued the plain language of the Leases and Defendants' "admitted practice of deducting T&F Fees before calculating Plaintiffs' royalties [was] based on [an] unreasonable interpretation of the Leases . . . [that] breache[d] the Leases by ignoring the 'never deduct' provisions and plain meaning of the word 'all'" in the "plant products royalty" provisions. *Id.* at 8.

On March 1, 2006, Defendants replied, argued summary judgment for Plaintiffs was improper because fact issues regarding Defendants' affirmative defenses of waiver, estoppel, and ratification existed, and moved for summary judgment by way of their affirmative defenses.  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 6, 10-16).

On March 21, 2006, Plaintiffs filed a cross-motion for summary judgment on Defendants' affirmative defenses. ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 15).  On April 10, 2006, Defendants again responded and asserted that fact issues existed, precluding summary judgment in favor of Plaintiffs on Defendants' affirmative defenses. ([Dkt. No. 29] Def.' Resp. to Pls.' Cross-Mot. for Summ. J. on Affirmative Defenses).

## II. DISCUSSION

As discussed above, both Plaintiffs and Defendants moved for summary judgment.  Plaintiffs moved for partial summary judgment based on contract interpretation of the royalty clauses and Defendants' alleged improper royalty deductions.  In response, Defendants moved for summary judgment, arguing they were entitled to it based on their affirmative defenses.  Plaintiffs subsequently moved for summary judgment on Defendants' affirmative defenses.  The Court will first set forth the applicable summary judgment law and then address the parties' motions.

### A.  Summary Judgment Standard Generally

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  Cross motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require the court determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record "which [the moving party] believes demonstrates the absence of a genuine issue of material fact" with respect to issues on which the movant bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 327 (1986); *Martinez v. Schlumber, Ltd.*, 338, F.3d 407, 411 (5th Cir. 2003); *P. Borgades-Account B, L.P. v. Air Products, L.P.*, 369 F.Supp. 2d 860, 864 (E.D. Tex. 2004).  The movant meets its initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial."  *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  While a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" *Anderson v. Libberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), the moving party need not negate the elements of the nonmovant's case. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

Once a moving party has met its burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, [rather] the adverse party's response . . . must

7

set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(c).  "The nonmovant's burden is not satisfied by 'some metaphysical doubt as to material facts,' conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or 'only a scintilla of evidence.'" *Borgades-Account*, 369 F.Supp. 2d at 865 (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).  Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  "In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts." *Decorative Ctr. of Houston, L.P. v. Direct Response Publ'ns, Inc.*, 264 F.Supp. 2d 535, 543 (S.D. Tex. 2003)(citing *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995) and *Little*, 37 F.3d at 1075).

The nonmovant's evidence is to be believed with all inferences drawn and all reasonable doubts resolved in its favor.  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990)(citing *Anderson*, 477 U.S. at 255).  The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts[,]" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999), but only reasonable inferences will be drawn from the evidence in favor of the nonmoving party. *Eastman Kodak Co. v. Image Tech, Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992).

If an adverse party completely fails to make a showing sufficient to establish an essential element of that party's case on which it will bear the burden of proof at trial, then all other facts are rendered immaterial and the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 322-23.

### B.  Summary Judgment Based on Affirmative Defenses

"'To obtain summary judgment, "if the movant bears the burden of proof on an issue . . . because . . . as a defendant [s]he is asserting an affirmative defense, [s]he must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [her] favor."'" *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)(citing *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002)); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.), *cert. denied*, 528 U.S. 1160 (2000)(holding that where defendant moves for summary judgment on basis of affirmative defenses, meaning defendant bears ultimate burden of persuasion at trial, defendant "must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto").

Once the defendant has proved all the elements of the affirmative defenses as a matter of law, the nonmovant can meet its summary judgment obligation by pointing the court to the absence of evidence to support the movant's or defendant's affirmative defenses.  *Momax, LLC., v. Rockland Corp.*, No. 3:02-CV-2613-L, 2005 U.S. Dist. LEXIS 6201 at *22 (N.D. Tex. April 11, 2005)(citing *Celotex Corp.*, 477 U.S. at 325).

Where a plaintiff moves for summary judgment, because the plaintiff does not bear the burden of proof at trial, she should obtain summary judgment simply by disproving the existence of any essential element of the opposing party's affirmative defenses.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

### C.  Issues for the Court

In the present case, there are three primary issues for the Court to resolve.  The first issue is whether Plaintiffs, as movants, satisfied their burden of production in their contract interpretation

summary judgment motion, and, assuming for now that Plaintiffs have met their burden and that the burden shifted to Defendants, whether Defendants, as nonmovants, satisfied their countervailing burden.   The second issue is whether Defendants satisfied their burden of production in their summary judgment motion based on affirmative defenses, and assuming they have, whether Plaintiffs met their burden.   The third issue is whether Plaintiffs met their burden of disproving the existence of any essential element of the Defendants' affirmative defenses in order to obtain a favorable summary judgment ruling.

### D.  First Issue: Interpretation of the Lease Provisions

Plaintiffs moved for partial summary judgment alleging Defendants' admitted practice of deducting transportation and other costs before calculating Plaintiffs' royalty violates the provisions of the Leases. ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 8).   Before addressing the contract interpretation issues, the Court will briefly discuss its jurisdiction to entertain the present suit and the rationale for applying Texas law to this contract dispute.

#### 1. Governing Law

A federal court sitting in diversity applies Texas law in the interpretation of contracts negotiated, drafted, and executed in Texas.   *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998)(citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1930)).   In Texas, an oil and gas lease is a contract and its terms are interpreted as such.   *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 778 (Tex. 1961); *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 359 (Tex. App.–Austin 2006, writ denied).

Here, this Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1332 because complete diversity exists between all Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00.[2] ([Dkt. No. 5] Pls.' First Am. Compl.¶ 54).  Because the Court is a federal court considering a case under diversity jurisdiction and the terms of the oil and gas leases require contract construction and interpretation, this case requires application of Texas contract law.

## 2.  Texas Law on the Interpretation of Oil and Gas Leases

Texas courts consider an oil and gas lease a contract.  *Anadarko Petroleum*, 94 S.W.3d at 554; *Skelly Oil*, 356 S.W.2d at 778; *Tana Oil & Gas*, 188 S.W.3d at 359.  Under Texas law, the interpretation of an unambiguous contract, as well as the determination of whether a contract is ambiguous, is a legal question.  *Steuber Co. v. Hercules, Inc.*, 646 F.2d 1093, 1098 (5th Cir. 1981); *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991).  If the contract terms are susceptible to only one reasonable construction, the contract is unambiguous and will be enforced as written.  *Guaranty Nat. Ins. Co. v. Azrock Industries, Inc.*, 211 F.3d 239, 243 (5th Cir. 2000); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

The primary duty of a court construing an unambiguous oil and gas lease is to ascertain the parties' intent as expressed within the lease's four corners.  *Nat'l Union Fire Ins. Co. v. Care Flight Air Ambulance Serv., Inc.*, 18 F.3d 323, 328-29 (5th Cir. 1994); *Luckel*, 819 S.W.2d at 461; *Sun Oil*

---

[2] Plaintiffs are composed of natural persons, limited partnerships, and corporations. ([Dkt. No. 5] Pls.' First Am. Compl.¶¶ 2-52).  Most of the Plaintiffs are citizens of Texas.  Plaintiffs alleged that none of the Plaintiffs are citizens of either Delaware or Oklahoma.  *Id.*  Defendant Kerr-McGee is a limited partnership.  It is composed of one limited and one general partner.  Each partner is a Delaware corporation with its principal place of business in Oklahoma. ([Dkt. No. 5] Pls.' First Am. Compl.¶ 53; [Dkt No. 7] Defs.' Answer to Am. Compl. and Countercl. ¶ 53).  Plaintiffs further alleged the improper deductions have reduced royalties due to them by more than $782,000.00. ([Dkt. No. 5] Pls.' First Am. Compl. 12).  Jurisdiction is therefore proper since the parties are citizens of different states and the amount in controversy exceeds $75,000.00.  *See* 28 U.S.C. § 1332.

*Co. v. Madeley*, 626 S.W.2d 726, 727-28 (Tex. 1981); *McMahon v. Christmann*, 303 S.W.2d 341, 344 (Tex. 1957). Courts should give the lease's language its plain grammatical meaning unless doing so would clearly defeat the parties' intentions. *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966). In determining the meaning of words, courts use the dictionary. *City of Corpus Christi v. Bayfront Assocs.*, 814 S.W.2d 98, 104 (Tex. App.–Corpus Christi 1991, writ denied); *Milton v. Aransas Shrimp Co-op.*, 668 S.W.2d 735, 739 (Tex. App.–Corpus Christi 1983, writ dism'd). Courts must examine the entire lease and attempt to harmonize all of its parts, even if different parts appear contradictory or inconsistent. *Luckel*, 819 S.W.2d at 462. Furthermore, no single provision will be given controlling effect. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Rather, all of the provisions within the contract must be considered with reference to the whole instrument. *Id.* This is so because courts presume that the parties to a lease intended every clause to have some effect. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 556 (Tex. 2002); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983).

In Texas, as in most jurisdictions, the parties to a contract are considered masters of their own choices and to that end they must select the terms and provisions to include in a contract before they execute it. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.–Amarillo 2000, no pet.); *Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487, 490 (Tex. App.–Amarillo 1984, no writ). Because the parties are masters of their own fate, they may thus voluntarily bind themselves in the manner they choose. *Cross Timbers Oil*, 22 S.W.3d at 26.

Courts in Texas may not rewrite an agreement between parties or make a new contract for the parties, one they did not make. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.

12

App.–Amarillo 1987, writ ref'd n.r.e.).  A court cannot change the contract merely because it or one of the parties dislikes the provision or think it unfair.  *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998).  For a court to change the parties' unambiguous agreement merely because the court dislikes the agreement, or because one of the parties subsequently found it distasteful, would undermine not only the sanctity afforded the contract but would also undermine the expectations of the parties who created and relied upon it.  *Cross Timbers Oil*, 22 S.W.3d at 26-27.

### 3.  Royalty Under Texas Law

Texas courts commonly define "royalty" as the landowner's share of production, free of all costs of development and production.  *Heritage Res.*, 939 S.W.2d at 121-22; *Delta Drilling Co. v. Simmons*, 338 S.W.2d 143, 147 (Tex. 1960); *Alamo Nat'l Bank v. Hurd*, 485 S.W.2d 335, 338 (Tex. Civ. App.–San Antonio 1972, writ ref'd n.r.e.).  Even though royalty is not subject to the costs of production, it is usually subject to post-production costs, including taxes, treatment costs to render the oil and gas marketable, and transportation costs.  *Martin v. Glass*, 571 F.Supp. 1406, 1410 (N.D. Tex. 1983); *Heritage Res.*, 939 S.W.2d at 122.  The general rule may be modified, however, by the respective parties through agreement, a division order, or a gas purchase contract.  *Martin*, F.Supp. at 1410; *Heritage Res.*, 939 S.W.2d at 122.

### 4.  Application of Texas Law to the Yturria and Garcia Leases

To support their motion for partial summary judgment Plaintiffs allege the "plant products royalty" provisions are not ambiguous.  ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 8).  And that said provisions require Defendants to pay royalties of one-fourth of seventy-five percent of "all" plant products or revenue derived from gas produced by Kerr-McGee from the leased premises. *Id.* at 10.  Plaintiffs further contend Defendants' conduct ignores the language of the "post-production

costs" provisions which state that Defendant shall never deduct from any royalty any expenses for transporting, marketing, or processing gas produced from the Leases. *Id.* at 3-4, 9. Plaintiffs ask for partial summary judgment because Kerr-McGee admitted that it calculates Plaintiffs' royalties after the deduction of T&F fees, meaning that Plaintiffs' royalty is not calculated on "all" plant products extracted from their leased properties. *Id.* at 6.

Defendants acknowledged that the "plants products royalty" provisions are unambiguous. ([Dkt. No. 20-1] Defs.' Cross-Mot. for Summ. J. 3). Defendants, in their initial response to Plaintiffs' complaint, also conceded they take into account the product marketing, transportation, and fractionation of plant products fee "prior" to calculating the royalty due to Plaintiffs. ([Dkt. No. 7] Defs.' Answer to Am. Compl. and Countercl. ¶64). Defendants then backtracked, denied they made this admission, and explained that the gas plant owner was the actual entity making the T&F fee deductions. ([Dkt. No. 20-1] Defs.' Cross-Mot. for Summ. J. 4). Defendants argued that it is the company with whom Defendants have contracted to process the gas who charges Defendants a fee for transporting and processing the natural gas liquids derived from Plaintiffs property and that this third party pays Defendants a "net" amount after it deducts transportation and processing costs.[3] *Id.*

---

[3] Below is Defendants' full explanation of said transaction.

[T]he gas plant owner (presently Enterprise Hydrocarbons, L.P. . . .) charges a fee to Kerr-McGee for transporting the natural gas liquids from the gas plants in Delmita and Gilmore, Texas to Corpus Christi, where Enterprise further processes the gas into commercially salable components such as propane. Enterprise reports revenues to Kerr-McGee from the sale of the natural gas liquids *net* of whatever T&F fees it charges and pays Kerr-McGee *net* of those fees. The plant owner does not even report to Kerr-McGee the amount it calculates it will charge each month for such fees. In calculating Plaintiffs' royalties, [Kerr-McGee] makes no deduction from the revenues used to calculate Plaintiffs' royalty for anything but severance taxes.

([Dkt. No. 20-1] Defs.' Cross-Mot. for Summ. J. 1)(emphasis added).

14

It is from the net revenue they receive from the processing plant owner that Defendants calculate Plaintiffs' royalties.  ([Dkt. No. 31-1] Mot. For Leave to Supplement Summ. J. Argument With Additional Authority and Br. in Supp. 3).

The Court begins its analysis by giving the "plant products royalty" provisions their plain grammatical meaning.  The "plant products royalty" clauses state Defendants shall pay "a royalty of one-fourth (1/4) of seventy-five percent (75%) of *all plant products, or revenue derived therefrom*, attributable to gas produced by [Defendants] from the leased premises."  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 5)(emphasis added).  Giving the "plant products royalty" provisions their plain grammatical meaning, such clauses require Defendant Kerr-McGee to pay royalties on "all" plant products or revenue derived from "all" plant products, attributable to gas produced by Defendants from the leased premises.  The dictionary defines "all" as "the whole of (used in referring to quantity, extent, or duration) . . . the whole number of (used in referring to individuals or particulars, taken collectively) . . . the greatest possible (used in referring to quality of degree) . . . every . . . *the whole quantity or amount* . . . the whole number; every one . . . *everything* . . . ."  RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 54 (2d ed. 2001)(emphasis added).  Based on the "plants product royalty" provisions, Kerr-McGee must therefore pay royalties on "all," i.e., the whole quantity or amount, of the plant products or revenue derived from the leased premises.

The distinction drawn by Defendants makes no difference.  Although the processing plant owner is the entity calculating and deducting the transportation and processing fee and not Defendants, the result is the same:  Plaintiffs' royalties are not being calculated on "all" plant products or revenue derived from Plaintiffs' leased property; rather Defendants have been calculating

15

Plaintiffs' royalty payments based on the "net" amount they actually receive.[4]  "Net" is defined as the amount "remaining after deductions . . . or expenses . . . ."  RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1290 (2d ed. 2001).  The amount received by Defendants, which is the amount used to calculate Plaintiffs' royalties, is therefore not all of the revenue derived or all of the plant products extracted from the leased properties.  Accordingly, Defendants' interpretation of the "plant products royalty" provisions is contrary to the plain grammatical meaning of the term "all."  The "post-production costs" provisions support this conclusion.  Said provisions make it clear that royalties "shall never bear" and "shall never be subject to" any post production costs or expenses.  A more detailed discussion regarding the "post-production costs" provisions will now be undertaken.

Plaintiffs allege the "post-production costs" provisions are unambiguous.[5]  ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 8).  They contend that the only reasonable interpretation of said provisions is that royalty payments "shall never bear" and "shall never be subject to" any post production costs or expenses because this interpretation gives full effect to all of the terms and provisions of the Leases, thereby rendering none meaningless.  *Id.* at 9.  Plaintiffs conclude they are

---

[4] The agreement between Defendants and the owner of the processing plant defines "net proceeds" as the value of the plant products based on published index prices with "adjustments by [the processing plant owner] for related services including, without limitation, product marketing, transportation, and fractionation of Plant Product . . . ."  ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 6)(citing Processing Agreement)).

"The phrase 'net proceeds' is by definition the sum remaining from gross proceeds of sale minus payment of expenses. (citations omitted)."  *Ramming v. Natural Gas Pipeline Co.*, 390 F.3d 366, 372 (5th Cir. 2004).

[5] While not explicit, Defendants appear to disagree with Plaintiffs unambiguous characterization of the "post-production costs" clauses.  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 3-4).  Nevertheless, where contract terms are susceptible to only one reasonable construction, the contract is unambiguous and will be enforced as written.  *Guaranty Nat. Ins.*, 211 F.3d at 243; *Columbia Gas Transmission*, 940 S.W.2d at 589.

entitled to summary judgment since Defendants' calculation of royalties after making deductions for the T&F fees simply ignores the "post-production costs" provisions.  *Id.* at 9-10.

Defending Plaintiffs' partial summary judgment motion, Defendants argued the "post-production costs" provisions should be considered  "surplusage." ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 8).  Defendants introduced *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118 (Tex. 1996), to substantiate their argument.

In *Heritage*, the lessee of an oil and gas lease deducted the cost to transport the gas from the wellhead to the point of sale as a post-production cost from the sales price before calculating the lessor's royalties.  *Heritage Res.*, 939 S.W.2d at 120.  Lessor objected to the deduction and argued the leases specifically prohibited the deduction.  *Id.*  There were two lease clauses at issue.  The first required lessees to calculate royalties based on the concept "market value at the well."  *Id.* at 120, 122.  One method – which was the one used by the court – of determining "market value at the well" involves subtracting reasonable post-production marketing costs from the market value at the point of sale.  *Id.* at 122.  In essence, calculation of "market value at the well" takes into account post-production costs to reach the market value of the oil and gas.  The second provision at issue in *Heritage* stated that "there shall be no deductions from the value of the lessors' royalty by reason of any required" post-production costs.  *Id.* at 120-21.  In resolving the dispute, the court found the lease provisions were unambiguous.  It then recognized that the commonly accepted meaning of the term "market value at the well" rendered the post-production clause in each lease surplusage as a matter of law since calculation of "market value at the well" inherently considers post-production costs.  *Id.* at 123.

On our facts, reliance on *Heritage* is misplaced.  For starters, *Heritage* dealt with a provision mandating calculation of royalties under "market value at the well."  Because the Leases in the present suit do not deal with "market value at the well," *Heritage* provides only limited guidance.[6] ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 7).

*Heritage* does, however, provide guidance in determining a lessee's royalty payment.  While *Heritage* declared that "royalty is usually subject to post-production costs, including . . . treatment costs to render it marketable and transportation costs[,]" *Heritage Res.*, 939 S.W.2d at 122, it also articulated that "the parties may modify this general rule by agreement."[7]  *Id.*  Here, the parties modified the general rule by agreement by requiring Defendants to pay Plaintiffs' royalty based on "all" plant products or revenue derived from the leased premises and instructing that Plaintiffs' royalty payments "shall never bear" and "shall not be subject" to any costs or expenses for production, transportation, marketing, etc. ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 8).  The parties in the present case are considered masters of their own choices, they selected the terms and the provisions in all four of the leases, and they voluntarily chose to bind themselves to the contractual terms.  *Cross Timbers Oil*, 22 S.W.3d at 26; *Emmer*, 668 S.W.2d at 490.   The Court will therefore not rewrite the agreement between Plaintiffs and

---

[6] Defendants acknowledge *Heritage*'s limited application to the present facts.  Defendants state, "[*Heritage*] went on to discuss the meaning of the term 'market value at the well[;]' however, since these leases do not involve market value at the well, that discussion is not particularly applicable."  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 8).  In another segment of their filing, Defendants state that the "plant products royalty" provisions of the Leases do "not establish a 'market value at the well' standard as is the case in many leases."  *Id.* at 5.

[7] Even Defendants agree with the latter part of *Heritage*.  They write in one of their motions that "parties to an oil and gas lease are free to contract for the calculation of royalty on any basis they choose . . . ." ([Dkt. No. 21]  Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 4).

Defendants merely because one of the parties dislikes the provisions.  *Neel*, 982 S.W.2d at 888-89; *Borders*, 727 S.W.2d at 359.   Additionally, Defendants' surplusage argument is unpersuasive because all of the provisions within the oil and gas leases must be considered with reference to the whole instrument, *Coker*, 650 S.W.2d at 393, since the Court presumes that the parties to the Leases intended every clause to have some effect.  *Thompson*, 94 S.W.3d at 556; *Heritage Res.*, 939 S.W.2d at 121; *Ogden*, 662 S.W.2d at 332.   Hence, the "post-production costs" provisions cannot and will not be ignored.

Defendants also rely on *Tana Oil and Gas Corporation v. Cernosek*, 188 S.W.3d 354 (Tex. App.–Austin 2006, pet. denied), to further their argument regarding construction of the royalty clauses.  ([Dkt. No. 31-1] Mot. For Leave to Supplement Summ. J. Argument With Additional Authority and Br. in Supp. 2-3).[8]   In that case, a class of royalty interest owners sued Tana, the lessee, for alleged underpayment of royalties.  *Tana Oil & Gas*, 188 S.W.3d at 358.   The royalty clauses required that the royalty be based on either "amount realized" or "net proceeds" from the sale of gas "at the well."  *Id.* at 360.   The class of plaintiffs conceded "amount realized" and "net proceeds" were synonymous.  *Id.* at 361.   Expanding on the class' concession, the court explained "net proceeds" expressly contemplated post-production deductions.  *Id.*  Thus, according to the court, the plain language of the applicable royalty clauses acknowledged that deductions may be necessary to determine the value of the gas "at the well."[9]  *Id.*

---

[8] The Court granted Defendants leave to supplement their summary judgment argument with additional authority on June 13, 2006. [Dkt. No. 35].

[9] The term "at the well" means before value is added by preparing the gas for market.  *Tana Oil & Gas*, 188 S.W.3d at 361.

*Tana* does not resolve the issues of the present case.  Here, the Leases do not contain a "net" proceeds provision and Plaintiffs have not conceded that the language "all plants products, or revenue derived therefrom" equates to net proceeds.  Rather Plaintiffs have consistently argued against calculation of their royalties based on the "net" proceeds Defendants acquired from the oil and gas produced from the leases.  ([Dkt. No. 12-1] Pls.' Mot. for Partial Summ. J. 6, 10; [Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 5).  Nor do the Leases provide that Plaintiffs' royalties be based on amounts received "at the well."  Most importantly and the key distinction between *Tana* and our facts is that *Tana* did not deal with a second provision instructing that Plaintiffs' royalties "shall never bear" and "shall never be subject to" any post production costs or expenses.  ([Dkt. No. 36] Pls.' Reply to Kerr-McGee's Supplement of Summ. J. 2-3).  *Tana* therefore provides little guidance.

In summary, reading the Leases as a whole, taking into consideration all of the provisions, and giving the language of the Leases its plain grammatical meaning, Plaintiffs, as moving parties, met their burden of informing the Court of the basis for their summary judgment motion regarding the Leases' interpretation and Defendants' breach.  For the reasons stated in this section, Defendants did not meet their countervailing burden.

Before making its final determination, the Court must examine the affirmative defenses raised by Defendants.  The Court must determine whether Defendants are nevertheless excused because Plaintiffs' conduct or actions constituted either a waiver or ratification or both.  The Court must also consider whether the equitable principle of quasi-estoppel precludes the Court from entering summary judgment for Plaintiffs.

### E.  Second and Third Issues:  Kerr-McGee's Summary Judgment Motion on Affirmative Defenses and Plaintiffs' Summary Judgment Motion on Defendants' Affirmative Defenses

Defendants raised the affirmative defenses of waiver, quasi-estoppel, and ratification and moved for summary judgment on these.  ([Dkt. No. 21]  Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 12-16).  As explained above, to obtain summary judgment Defendants must establish beyond peradventure "all" of the essential elements of their defenses, *Martin*, 353 F.3d at 412, and "must adduce evidence to support each element of [their] defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." *Rushing*, 185 F.3d at 505.  Should Defendants prove all of the elements of their affirmative defenses as a matter of law, Plaintiffs can meet their summary judgment obligation by pointing the Court to the absence of evidence to support Defendants' affirmative defenses. *Momax*, 2005 U.S. Dist. LEXIS 6201 at *22; *see also Fontenot*, 780 F.2d at 1194 (instructing that where plaintiff moves for summary judgment, because plaintiff does not bear burden of proof at trial, she should obtain summary judgment simply by disproving the existence of any essential element of opposing party's affirmative defenses).  Accordingly, each affirmative defense – waiver, quasi-estoppel, and ratification – raised by Defendants will be discussed in turn.  The Court commences its discussion with Defendants' affirmative defense of waiver.

### 1.  Waiver

Under Texas law, the elements of waiver include: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence, and; (3) actual intent to relinquish the right, which can be inferred from conduct. *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 313 (5th Cir. 2005); *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F.Supp.2d 509, 524, (E.D. Tex.

2005); *ASI Techs., Inc. v. Johnson Equip. Co.*, 75 S.W.3d 545, 548 (Tex. App.–San Antonio 2002,

pet. denied); *Vessels v. Anschutz Corp.*, 823 S.W. 762, 765 (Tex. App.–Texarkana 1992, writ

denied).  Waiver is generally a fact question of intent.  *Hesseltine*, 391 F.Supp.2d at 524 (quoting

*Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 608 (5th Cir. 2000).  Nonetheless,

"'when the facts and circumstances are admitted or clearly established, the question becomes one

of law.'"  *Monumental Life Ins.*, 403 F.3d at 313 (quoting *Motor Vehicle Bd. of Tex. Dep't of Transp.*

*v. El Paso Ind. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999).

Here, Defendants contend Plaintiffs' conduct satisfied the three enumerated elements for

waiver.  Defendants allege,

> First, Plaintiffs, in the prior lawsuits, asserted that they had an existing right under
> the leases to have their NGL royalties calculated without any deduction of costs.
> Second, the Plaintiffs, having asserted that right in the earlier lawsuits clearly
> demonstrated they had actual knowledge of that method of calculating their royalty.
> Third, the acts of settling the lawsuit in which these claims were originally asserted,
> without requiring any payment as a consequence of those deductions and without
> requiring any change in that method of calculating their own royalty in the future,
> demonstrates an intention that those rights be relinquished by the Yturrias.  The
> Garcia Plaintiffs' dismissal of those claims in the earlier lawsuits likewise indicates
> an intention to abandon those rights.

([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 13-14).  According to Defendants,

"[t]he settlement, dismissal, and release of the Plaintiffs' NGL underpayment claim in the prior

lawsuits, coupled with Plaintiffs' acceptance of royalty payments net of transportation costs since

[settlement of the lawsuits in 1995and 1996] are sufficient to establish waiver . . . ."  *Id.*

To counter Defendants' contentions, Plaintiffs argue that the settlements and releases are

expressly limited to claims arising "prior" to the settlement date.[10]  ([Dkt. No. 27-1] Pls.' Cross-Mot.

_____

[10] The Yturrias settled in December of 1995 and the Garcias in February of 1996.  ([Dkt. No.
20-1] Defs.' Cross-Mot. for Summ. J. 8, 11).  The Yturria and Garcia release clauses, being almost

for Summ. J. on Kerr-McGee's Affirmative Defenses 25 (citing Yturria Settlement Agreement § 5.1 and Garcia Settlement Agreement § 5.1)).  Plaintiffs further argue that the Texas Supreme Court has recognized that the release language from the parties' settlement does not release Plaintiffs' claims against Kerr-McGee that arose subsequent to the date of the release.  *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000)(finding release clause forgave all claims between June 1, 1988 and April 1, 1992, but holding release did not apply to claims or causes of action occurring or arising after April 1, 1992); *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex. 1991)(rejecting bank's defense that prior release by customer attributable to specific loan transaction between bank and customer also applied to subsequent litigation where customer raised claims relating to another transaction with the bank).  Plaintiffs conclude they are thus not barred from bringing this new lawsuit to recover for new damages arising from new conduct by Kerr-McGee that breached new royalty provisions of the Leases.  ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 25).

The Court agrees with Plaintiffs.  The fact that the releases apply to claims arising "prior" to the settlement date leads the Court to find that Defendants cannot establish the third waiver element – that Plaintiffs actually intended to or that Plaintiffs' conduct infers that they intended to

---

identical, state in pertinent part,

> Plaintiffs on the one hand and Defendants on the other . . . hereby fully and finally release . . . whether in contract or tort which (1) any of the Parties have asserted or could have asserted against one another in the Lawsuit or (2) which arise from any obligation, act or omission involving the Leases *prior to the Settlement Date*. Nothing herein, however, shall be construed or is intended to preclude any of the Parties from seeking to enforce, or instituting suit to seek to redress a breach of, this Agreement.

([Dkt. No. 25-27] Ex. 21 at 15; [Dkt. No. 25-43] Ex. 35 at 11-12)(emphasis added).

relinquish their right to the full amount of royalties post-settlement. *See Celotex*, 477 U.S. at 322-23 (mandating entry of summary judgment against party who fails to establish existence of an element essential to that party's case and on which that party will bear burden of proof at trial). Defendants, as movants, have therefore failed to establish beyond peradventure "all" of the essential elements of the defense of waiver to warrant summary judgment in their favor. *Martin*, 353 F.3d at 412; *Rushing*, 185 F.3d at 505. Hence, Defendants cross-motion for summary judgment on their waiver defense is DENIED, and Plaintiffs' summary judgment motion on this defense is GRANTED.

### 2. Quasi-estoppel

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed*, 22 S.W.3d 857, 864 (Tex. 2000); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.–Corpus Christi 1994, writ denied); *Vessels*, 823 S.W. at 765. Quasi-estoppel applies when it would be unconscionable to allow a party to maintain a position inconsistent with one to which she has acquiesced, or from which she accepted a benefit. *Lopez*, 22 S.W.3d at 864; *Albrecht*, 878 S.W.2d at 240; *Vessels*, 823 S.W. at 765. The doctrine applies where a party accepts the benefits of a transaction, then takes an inconsistent position to avoid corresponding obligations or effects. *Albrecht*, 878 S.W.2d at 240. Quasi-estoppel does not require a showing of misrepresentation or detrimental reliance. *Albrecht*, 878 S.W.2d at 240; *Vessels*, 823 S.W. at 765.

Defendants allege that based upon quasi-estoppel they are entitled to summary judgment. ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 15). Defendants contend that after the parties settled the 1993 lawsuits they provided Plaintiffs' counsel reports outlining the method by which royalties were being calculated. ([Dkt. No. 30] Mem. in Supp. of Defs.' Resp. to Pls.'

Cross-Mot. for Summ. J. on Affirmative Defenses 6).  It is further alleged that these reports gave Plaintiffs the necessary information to monitor their royalty payments and that Plaintiffs thus had knowledge of the manner in which Defendants calculated Plaintiffs' royalty payments.  *Id.*  To complete their argument, Defendants argue "Plaintiffs acquiesced in NGL payment[s] being calculated . . . from 1996 until the initiation of this lawsuit[,]" and that "[i]t would be unconscionable to allow Plaintiffs to take an inconsistent position now, after acquiescing to NGL royalties as calculated for the last ten years, a *benefit* [Plaintiffs] have clearly been accepting under the amended leases." ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 15)(emphasis added).

    Plaintiffs assert they have "not benefitted" from the underpayment of royalties, but that Defendants have because, to date, Defendants have retained in excess of $700,000 in royalties on natural gas liquids.  ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 29 (citing John Green Audit)).  Plaintiffs also allege that Defendants' reliance on the spreadsheet argument fails to establish how Plaintiffs' current stance is "inconsistent with a position previously taken" given that Plaintiffs have never changed their position regarding how they expected royalties to be calculated.  Plaintiffs contend that the facts show that they relied on Defendants' representation in the settlement agreements that Defendants would pay royalties pursuant to the current terms of the Leases.  *Id.*  Plaintiffs further allege Defendants cannot show and have not shown unconscionability.  *Id.*  Plaintiffs next argue Defendants failed to show the manner in which Plaintiffs "acquiesced," given that Plaintiffs pursued dispute resolution and then filed suit soon after learning that Defendant were paying royalties subject to deductions.  *Id.* at 27.

    The Court will first address the benefits argument.  It defies the Court how Defendants managed to conclude that Plaintiffs have benefitted in accepting, for the past ten years, an

underpayment of royalties.  To be blunt, the Court sees no benefit.  This is enough to resolve Defendants' quasi-estoppel argument because under Texas law "quasi estoppel is 'inapplicable where the conduct allegedly giving rise to estoppel is not shown to have benefitted a party sought to be estopped.'" *Bott v. J.F. Shea Co.*, 299 F.3d 508, 512 (5th Cir. 2002)(citing *Long v. Turner*, 134 F.3d 312, 318 (5th Cir. 1998)(citing Texas cases)).  Nevertheless, the Court will now dispose of the other allegations presented by Defendants.

Although Defendants place great reliance on the spread sheet with their counsel's handwritten notes, to charge that Plaintiffs had actual knowledge of their royalty deduction scheme, ([Dkt. No. 25-29] Ex. 22 at 2, 9), Defendants fail to explain how that evidence satisfies all of the elements of quasi-estoppel.  *See VT, Inc. v. Geico Ins. Co.*, No. 3:03cv522, 2004 U.S. Dist. LEXIS 11849, at *24 (N.D. Tex. June 16, 2004)(granting plaintiff's motion for summary judgment on defendant's quasi-estoppel defense because defendant in asserting its defense did not cite record, nor explain how its evidence satisfied the elements of quasi-estoppel; court further found there was no evidence plaintiff was taking position inconsistent with one in which he accepted benefit, nor was there any evidence of unconscionability).  Additionally, Defendants failed to adduce evidence of unconscionability.  *Id.*  Moreover, "acceptance by the lessors of less royalty than that to which they were entitled does not 'extinguish the entire debt nor work an estoppel.' (citations omitted)." *Foster v. Atlantic Refining Co.*, 329 F.2d 485, 490 (5th Cir. 1964).  As a result, Defendants did not "establish beyond peradventure *all* of the essential elements of the [quasi-estoppel] defense to warrant judgment in [their] favor." *Martin*, 353 F.3d at 412; *Rushing*, 185 F.3d at 505. Defendants' cross-motion for summary judgment on the defense of quasi-estoppel is therefore DENIED, and Plaintiffs' summary judgment motion on this defense is GRANTED.

26

### 3.  Ratification

The elements of the ratification defense are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Motel Enter., Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App.–Houston [1st Dist.] 1990, no writ).

Defendants argue Plaintiffs have ratified the method used to calculate the royalties and, as such, Defendants are entitled to judgment as a matter of law.  ([Dkt. No. 21] Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. 16).  Specifically, Defendants allege the reports they provided Plaintiffs' counsel made "clear" that the royalties were being calculated on net revenues received from the processing plant owner, and that these reports were sufficient for purposes of monitoring the royalty calculations. *Id.* at 15-16.  They contend that the conduct of Plaintiffs in accepting the benefits of the prior settlement and the continued calculation of royalties on the same basis that led to Plaintiffs' prior lawsuit constitutes ratification of the method in which Defendants calculated the royalties. *Id.* Defendants charge that counsel for Plaintiffs "clearly" knew of the methodology under which royalties were being calculated after the amendments, yet Plaintiffs never objected to that methodology until this suit. *Id.*

Plaintiffs counter that Defendants have no evidence that Plaintiffs adopted Defendants' improper payments of royalties, nor can Defendants prove that Plaintiffs had full knowledge of all material facts regarding the royalty payment deduction scheme, or that Plaintiffs intended to adopt or ratify Defendants' payment of royalties. ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 30-31).

Once again, Defendants' summary judgment evidence fails to squarely address the enumerated elements of ratification.  Their evidence does not establish how receipt of the reports containing the royalty calculations constitutes (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act.  Even assuming Defendants' argument satisfies the first two elements of ratification – (1) approval by act, word, or conduct (2) with full knowledge of the facts of the earlier act – meaning the reports Defendants provided Plaintiffs gave Plaintiffs full notice of how royalties were being calculated and Plaintiffs' conduct of receiving royalty payments was approval by act or conduct with full knowledge of the facts of the earlier act – contentions Plaintiffs deny – Defendants have not presented evidence or pointed the Court to evidence in the record showing that Plaintiffs' conduct of accepting payments was with the "intention" of giving validity to the earlier act.  ([Dkt. No. 27-1] Pls.' Cross-Mot. for Summ. J. on Kerr-McGee's Affirmative Defenses 30-31).  Plaintiffs, by merely "keeping less than was due [to] them[,]" have not ratified the act of Defendants' payment scheme. *See Foster*, 329 F.2d  at 490 ("By keeping less than was due them . . . something to which they were entitled [to] . . . the [plaintiffs] have not ratified the act of [defendant] in selling their royalty gas for less than the prevailing market price.").  As a consequence, Defendants have not established beyond peradventure "all" of the essential elements of the defense of ratification.  *Martin*, 353 F.3d at 412; *Rushing*, 185 F.3d at 505.  Defendants' cross-motion for summary judgment on this defense is thus DENIED, and Plaintiffs' summary judgment motion as to this defense GRANTED.

### III.  CONCLUSION

Based on the foregoing discussion, Plaintiffs' Motion for Partial Summary Judgment is GRANTED, Defendants' Cross-Motion for Summary Judgment is DENIED, Plaintiffs' Cross-Motion for Summary Judgment on Kerr-McGee's Affirmative Defenses is GRANTED, and all other pending motions are DENIED.

IT IS SO ORDERED.

Signed this <u>6th</u> day of November, 2006, in Laredo, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE


**To Insure Proper Notice, Each Party Who Receives This Order Shall Forward a Copy of it to Every Other Party And Affected Non-party Even Though They May Have Been Sent One by The Court.**